Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms with minor modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. The parties are properly before the Commission, and the Commission has jurisdiction of the parties and of the subject matter. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. Defendant Liberty Mutual was the carrier at risk on the date of the alleged injury by accident or specific traumatic incident on or about 12 May 2003.
4. The parties stipulated that the wages were sufficient to generate the maximum weekly compensation rate for 2003, of $674.00 per week.
5. Subsequent to the hearing, the parties entered into an additional stipulation as follows: "The parties stipulate that defendants are entitled to a credit for all `net' S A benefits received by plaintiff for any period of time for which he is claiming entitlement to disability benefits. The parties further stipulate that `net' S A benefits are S A benefits, less any taxes taken out on said gross benefits."
6. The issues for determination are:
 a. Whether plaintiff suffered an injury by accident or specific traumatic incident to his neck and upper back on or about 12 May 2003?
 b. If so, to what benefits is he entitled?
 b. To the extent that plaintiff is disabled, whether his disability is related to the accident in question?
 d. Whether plaintiff is entitled to attorney's fees and costs pursuant to N.C. Gen. Stat. § 97-88.1?
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, the plaintiff was 50 years old. Plaintiff began working for defendant-employer in May 1990, and was employed as a driver of a battery-powered tread truck, hauling tread. Plaintiff was not required to either load or unload the truck.
2. On 6 November 2002, five months prior to the work incident at issue the plaintiff was involved in a non-work-related, serious motor vehicle accident wherein he "T-boned" another vehicle which pulled in front of him as he traveled down Highway 53. Plaintiff was traveling 45 miles per hour at the time of impact, and the other car was traveling 25 miles per hour. Plaintiff's car traveled another 40 feet following impact, and the other car traveled an additional 50 feet. Neither car was operable following the motor vehicle accident.
3. An ambulance arrived at the scene and plaintiff noted complaints of right knee pain with a 1/8 inch hematoma to the back of his left hand. The EMS report did not reference any complaints or injuries. The Emergency Room report stated that plaintiff experienced mild pain, and had a right knee displaced transverse fracture through the inferior pole of the patella. There were no complaints of pain other than in the right knee.
4. Upon his arrival at the hospital, plaintiff immediately underwent surgery performed by Orthopaedic Surgeon Stephen Kouba to repair a broken right kneecap and torn patella tendon. As a result of injuries sustained in the motor vehicle accident, plaintiff did not work from 6 November 2002 through 5 March 2003.
5. Plaintiff continued to treat with Dr. Kouba for injuries sustained in the motor vehicle accident, as well as other conditions, including diabetes and sleep apnea. Dr. Kouba diagnosed plaintiff with advanced osteoarthritis of the hip, as a result of having to favor his left knee following the accident. None of these conditions are related to plaintiff's employment with defendant-employer.
6. On 12 May 2003, plaintiff was sitting still in his battery-powered tread truck when a co-worker, James Newkirk, who was driving a similar truck, struck plaintiff from behind. Mr. Newkirk could not have been traveling more than 5 or 6 miles per hour at the time of impact, as that is the maximum speed of the tread trucks. Neither the plaintiff's nor Mr. Newkirk's tread truck was dented, dinged, or otherwise damaged in the incident.
7. Plaintiff testified that at the point of impact his head snapped back and he was momentarily "stunned." Both men continued to operate the trucks as usual for the remainder of the workday. Plaintiff reported the incident that day to his supervisor, James Stanley, but did not report any pain or neck problems to Mr. Stanley. Plaintiff did not fill out an accident report, planning to do so should he begin to feel "any backlash" from the incident. Plaintiff continued to work his regular job on a regular schedule for the remainder of that day.
8. On 12 May 2003, following the work incident, plaintiff presented to Dr. Kouba complaining of groin pain, an inability to stand and walk, his arthritic hip, and his diabetes. Plaintiff did not mention the work incident or any neck pain. Dr. Kouba advised plaintiff to get his diabetes and weight problem under control and confirmed plaintiff's advanced hip arthritis, noting his left hip was essentially "bone on bone," and that he would need a hip replacement. Dr. Kouba informed plaintiff on this visit that he would need to undergo a lifestyle change, which would require medical retirement from defendant-employer. Dr. Kouba told plaintiff that he was totally disabled due to his hip, knee, and diabetes. Dr. Kouba initiated the paperwork for plaintiff's medical retirement, provided him with a permanent handicapped sticker, and instructed him to return in three months to prepare for a hip replacement.
9. On 13 May 2003, plaintiff presented to his family doctor, Internist Pravin Patel, for treatment of his diabetes and sleep apnea. Dr. Patel testified that plaintiff did not mention anything about neck pain; however, the medical notes for that date contain the following hand-written notation: "Pain in the back of the neck — 6 months, some stiffness, non-radiating, Ø numbness or tingling."
10. Plaintiff returned to Dr. Patel on 16 May 2003, with complaints of joint pain and stiffness in his neck. Dr. Patel is unable to recall whether plaintiff related the pain to any specific incident. On 23 May 2003, plaintiff again presented to Dr. Patel. The notes from that visit state, "Pain in the back of the neck since the MVA in Nov. 2000." Dr. Patel opined that he either erroneously recorded the date as 2000, when plaintiff stated 2002, or that plaintiff may have mistakenly given the date of the motor vehicle accident as November 2000. Plaintiff contends that Dr. Patel meant to record that plaintiff had been suffering neck pain since the work incident of 12 May 2003; however, Dr. Patel testified that plaintiff did not mention any work incident until August 2003, and that Dr. Patel's office notes make no mention of any such incident prior to August 2003.
11. At Dr. Patel's direction, plaintiff underwent an MRI in June 2003. Plaintiff reported to the radiologist at that time that he had experienced neck pain since his motor vehicle accident of November 2002. Plaintiff did not provide a history of his work incident of 12 May 2003. The MRI report gives the history of a "49 year old male with neck pain and right shoulder and right arm pain since MVA in November 2002." The MRI revealed right-sided degenerative facet joint disease present at C4-5, which causes moderate right neural foraminal narrowing. No evidence of broad based disc bulge, focal disc herniation or central canal stenosis is demonstrated at C4-5. The left neural foramen was patent at this level. The other levels are unremarkable.
12. An addendum to the MRI report references that on 11 August 2003, "the patient has called and stated that he did not mention to the technologist that he did have a work related injury related to his neck pain and right shoulder pain in June 2003."
13. Plaintiff presented to Dr. Patel again on 5 June 2003, and 1 July 2003, complaining of neck pain, but did not mention the work incident of 12 May 2003, at either visit.
14. Plaintiff filed a written accident report with defendant-employer on 9 June 2003. Although plaintiff testified that he believed he went to the dispensary several times complaining of neck pain prior to filing that report, there are no dispensary records to corroborate this. The first record of plaintiff presenting to the dispensary with complaints of neck pain is 31 July 2003. The dispensary record indicates that plaintiff reported to the physician's assistant that he had been treating with a physician for neck pain since his motor vehicle accident in November 2002.
15. On 11 August 2003, plaintiff returned to Dr. Patel with complaints of neck pain. At this visit, plaintiff provided a history of a work-related accident in May 2003. Plaintiff described the pain as continuous, with some stiffness and grinding with side-to-side head movements. Head turning caused sharp pain radiating down his left arm. Dr. Patel wrote plaintiff out of work pending further evaluation.
16. On 13 August 2003, plaintiff presented to Dr. Kouba with complaints of neck and upper arm pain. Plaintiff gave a history of the 12 May 2003 work incident in which he suffered whiplash, with his neck pain increasing from that date. Dr. Kouba examined plaintiff and reviewed the MRI films. He diagnosed plaintiff with arthritis, some nerve impingement, nerve involvement and swelling at C4-5 on the right. He recommended physical therapy and traction and anti-inflammatories. Dr. Kouba opined that if plaintiff did not improve, he would need treatment from a neurosurgeon.
17. On 29 September 2003, Dr. Kouba opined that plaintiff was permanently disabled from work due to his right knee, left hip and diabetes. There is no mention of plaintiff's neck or upper arm pain as a factor in Dr. Kouba's opinion. Dr. Kouba opined that he did not list the neck condition because the MRI showed plaintiff's neck condition as chronic and that it might improve.
18. On 19 December 2003, and upon referral from Dr. Patel and Dr. Kouba, plaintiff presented to neurosurgeon Dr. Kim E. Koo. Plaintiff's primary complaint was of neck pain, and he gave a history of being rear-ended while in a stopped truck at work. Plaintiff also stated that his neck symptoms did not appear until approximately two weeks after the incident. Dr. Koo examined plaintiff and reviewed the MRI. She diagnosed plaintiff with cervical sprain and strain, cervical spondylosis, severe morbid obesity, history of diabetes, high cholesterol and right knee and left hip disease. Dr. Koo recommended physical therapy and exercise.
19. While Dr. Koo opined that she could not attribute plaintiff's condition to his work incident because of the length of time between the incident and the onset of symptoms, she later opined that the medications plaintiff was taking during this period for his other conditions could have masked the neck symptoms for some period of time. Dr. Koo also opined that given plaintiff's complaints of neck pain after the 2002 motor vehicle accident and the 2003 work incident, she could only speculate as to an apportionment of plaintiff's neck pain between the two incidents.
20. Plaintiff returned to Dr. Kouba on 14 January 2004, with complaints of neck stiffness. Dr. Kouba noted that while plaintiff demonstrated a limited range of motion, there was no evidence of nerve impairment; therefore, he opined that plaintiff was suffering from chronic neck pain secondary to multi-level cervical disk disease. Because plaintiff expressed dissatisfaction with Dr. Koo, Dr. Kouba referred plaintiff to anesthesiologist Dr. Viren Desai, for pain management.
21. Plaintiff presented to Dr. Desai on 28 January 2004, with complaints of neck pain radiating into his right forearm. He diagnosed plaintiff with a possible bulging or herniated cervical disk, cervical radiculitis and cervical spondylarthritis. He recommended a series of epidural injections, which were begun on 10 February 2004.
22. Following the epidural injections, plaintiff experienced some relief of his symptoms. Dr. Desai opined that it was most likely that the work-related incident of 12 May 2003, aggravated plaintiff's pre-existing condition, but he did not address the issue of plaintiff's ability to perform his job due to the resulting symptoms.
23. On 9 February 2004, Dr. Kouba completed a "Goodyear Tire 
Rubber Company Impairment Evaluation for Disability Pension" on plaintiff's behalf. The form notes that the primary diagnosis causing the impairment is "L hip pain." Plaintiffs subjective complaints are listed as "pain L hip, neck," the supporting diagnosis is "advanced arthritis L hip," and the relevant hospitalization is noted to be "left total hip replacement." The secondary diagnosis causing impairment is "neck pain chronic."
24. On 8 March 2004, Dr. Kouba wrote plaintiff's counsel for the 6 November 2002 motor vehicle accident, Lloyd Brisson, and stated that upon the discovery of plaintiff's advanced osteoarthritis of the hip that would require hip replacement, initiating plaintiff's retirement was recommended. The letter also noted that the replacement surgery was complicated by a job-related injury to the cervical spine for which plaintiff was undergoing pain management for chronic pain. The letter was re-sent with a correction on 19 April 2004, specifically noting that the hip condition was unrelated to the 6 November 2002 accident, and the neck pain was related to the 12 May 2003 work injury.
25. Dr. Kouba opined that while it was possible, it would be highly unusual for plaintiff to suffer a whiplash injury and not mention it to any of his physicians until weeks later. Further, although he noted that plaintiff's medications could have masked the symptoms for a period of time, Dr. Kouba opined that if plaintiff had been complaining of chronic neck pain since the November 2002 accident, that pain could also have been masked by the medication. He also opined that it was more likely that the neck condition was the result of the high impact collision rather than the minor work place incident.
26. Dr. Kouba further opined that plaintiff's total disability was approximately 80% due to his hip, 15% due to his knee condition, 3% because of the neck condition and 2% due to the diabetes. Dr. Kouba described the neck condition as "minimal in terms of [plaintiff] having to retire because his job was really driving a truck. It wasn't lifting heavy objects and throwing things back and forth."
27. On 23 December 2004, plaintiff presented for an evaluation by neurosurgeon Dr. Malcolm Shupeck upon referral by Dr. Patel. Dr. Shupeck reviewed plaintiff's MRI and opined that there was no compressive lesion. He ordered a cervical myelogram, which was performed on 28 January 2005. The myelogram showed arthritic changes in the neck joints, worse at C4-5, lesser in C5-6. Dr. Shupeck opined that the facet changes take years to occur; however, trauma could accelerate the process.
28. Dr. Shupeck diagnosed plaintiff with cervical radiculopathy with an underlying etiology of facet arthropathy. Because of the time lapse, Dr. Shupeck was unable to offer an opinion regarding the causation of plaintiff's condition.
29. Plaintiff suffered an injury by accident arising out of and in the course of his employment with defendant-employer on 12 May 2003. Although plaintiff may have suffered some neck pain prior to the work-related incident as a result of the November 2002 accident, the Full Commission gives greater weight to the opinion testimony of Dr. Desai that the 12 May 2003 work-related accident most likely aggravated his pre-existing cervical condition. Dr. Koo and Dr. Kouba both agreed that plaintiff's medication for other conditions could have masked his symptoms of neck pain for a period of time; and it is not possible to apportion plaintiff's pain between the November 2002, and 12 May 2003 work-related incident.
30. As a result of his work-related injury, Dr. Patel took plaintiff out of work on 11 August 2003, "pending further evaluation." This evaluation was accomplished by Dr. Kouba who, on 29 September 2003, took plaintiff permanently out of work due to his right knee, left hip and diabetes. Dr. Kouba did not take plaintiff out of work based on his neck symptoms, and in fact, opined that plaintiff's neck condition was minimal in regards to necessitating his retirement. Therefore, the Full Commission finds as fact that subsequent to 29 September 2003, plaintiff's disability from work was due to conditions unrelated to his work-related injury.
31. Plaintiff's average weekly wage at the time of his disability was sufficient to generate the maximum weekly compensation rate for 2003, of $674.00 per week.
32. Defendants have not defended this claim unreasonably.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of the employment on 12 May 2003, which aggravated his pre-existing condition and resulted in his being written out of work beginning on 11 August 2003. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff was written out of work on 11 August 2003, in order to obtain further evaluation. Following the evaluation, plaintiff was deemed permanently disabled due to medical conditions unrelated to his compensable injury by accident. Further, plaintiff's condition resulting from the work-related injury was medically deemed "minimal" and the greater weight of the medical evidence shows that plaintiff's ongoing disability is not the result of the work-related injury. Therefore, plaintiff is entitled to temporary total disability compensation at the rate of $674.00 per week for the period from 11 August 2003 through 29 September 2003. N.C. Gen. Stat. § 97-29.
3. As a result of his injury, plaintiff sustained a 3% permanent partial impairment to his neck for which he is entitled to compensation for 9 weeks at the rate of $674.00 per week.
4. Plaintiff is entitled to have defendants pay for medical expenses incurred or to be incurred as a result of the compensable neck injury as may be required to provide relief, effect a cure or lessen the period of disability, including but not limited to the treatment provided by Dr. Patel, Dr. Desai, Dr. Koo, Dr. Kouba and Dr. Shupeck. N.C. Gen. Stat. § 97-2(19).
5. Defendants have not defended this claim without reason; therefore, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
6. Defendants are entitled to a credit for all "net" S A benefits received by plaintiff for the period of compensable disability from 11 August 2003 through 29 September 2003. Said "net" S A benefits are S A benefits less any taxes taken out on said gross benefits, and the net credit is subject to a reasonable attorney's fee of 25%, payable to plaintiff's counsel.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved and a credit for all "net" S A benefits received by plaintiff for the period of compensable temporary total disability, defendants shall pay temporary total disability compensation to plaintiff at the rate of $674.00 per week for the period from 11 August 2003 through 29 September 2003. Defendants shall also pay to plaintiff permanent partial disability for 9 weeks for the 3 % rating to his neck. As said compensation has accrued, it shall be paid in a lump sum.
2. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved to be deducted from sums due plaintiff as calculated prior to the S A set off against temporary total disability, and paid directly to counsel.
3. Defendants shall pay medical expenses incurred or to be incurred when bills for the same have been approved, in accordance with the provisions of the Act.
4. Defendants shall pay the costs.
This the __ day of September 2006.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER